BARBERA, J.
This appeal involves a real estate broker’s entitlement to a commission in connection with a commercial lease. In decid *121 ing the case, we have the opportunity to discuss the procedures set forth in Maryland Code (1974, 1996 Repl.Vol.), § 14-301 et seq. of the Real Property Article (“RP”), which prescribe both how a broker establishes a lien and, more particular to this case, how the owner responds to that effort.
All of the individuals involved in the controversy are the grandchildren and great-grandchildren of the late David W. and Annie Chertkof. As a result of the dispute, appellant, Howard L. Chertkof & Co., Inc., filed in the Circuit Court for Baltimore County a petition to establish a broker’s lien (“the petition”), pursuant to RP § 14-304. Howard Chertkof was the president and principal of appellant.[1]
Appellant lodged the petition against Howard Chertkofs cousins, Joseph Gimbel, Helene Miller, Stephanie Prince, Jeffrey Clayten, Donald Brown, and Martha Lee Fendler, appellees. The petition related to the property located at 439-51 Eastern Avenue in Essex (“the Property”), which is now leased to the State of Maryland. Initially, appellant sought a lien of $54,862.50, but later amended the claim to $67,237.50. Appellant’s claim is predicated largely on a Management Agreement executed in April 1988.
Following the sale of the Property to appellees, appellant filed a petition for a broker’s lien. The circuit court issued an order directing appellees to show cause why the lien should not issue. Appellees duly responded.
The court, finding probable cause to believe that appellant was entitled to a lien, by memorandum and order established an interlocutory lien and identified four issues to be decided at trial. Following a bench trial, another member of the court ruled in a written opinion that appellant was not entitled to a broker’s lien and entered judgment terminating the interlocutory lien.
Appellant presents the following questions on appeal:
*122 I. Did the trial court err in denying the petition for broker’s lien: (a) based on issues that were not alleged by appellees in their response to the petition; (b) in the face of statute and case law providing that any matters not so raised were waived; (c) on issues which were not identified as issues for trial in the July 3, 2000, order imposing an interlocutory lien; (d) on ' issues on which appellees had the burden of pleading and proof, and (e) on issues which appellant had no notice were to be considered by the trial court?
II. Did the trial court err in ruling that appellees were bona fide purchasers for value of the Property, where appellees were owners of the Property before and after the lease with the State was signed, were fully aware of appellant’s claim, and where appellees contractually agreed to pay the lease commission under the Management Agreement with appellant?
III. Did the court below err in ruling that appellant was not entitled to a broker’s lien based upon ¶ 15.2 of the Management Agreement, in the absence of any evidence related to that provision, and where that provision addresses the internal allocation of certain expenses, as between and among the owners, and does not address the commissions for new leases owed to third parties such as appellant?
For the reasons that follow, we vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion.
FACTS AND LEGAL PROCEEDINGS
The relevant underlying facts are contained in the unpublished opinion of this Court authored by the Honorable Ellen L. Hollander, Howard L. Chertkof & Co., Inc. v. Joseph Gimbel, et al., No. 969, September Term, 2001 (filed June 25, 2002) (“Chertkof I ”). We repeat that factual summary here:
On or about February 9,1968, the late David W. Chertkof and his wife, Annie, executed a Revocable Trust Agreement, *123 by which they created the “DWC Trust.” Its assets consisted of approximately twenty commercial properties, including the Property that is at the center of this controversy. The DWC Trust created a life interest in its assets for the benefit of the Chertkofs’ four children: Jack Chertkof (who died in 1982), Ethel Posnick (who died in January 1995), Ben Clayten (who died in October 1995), and Helen Gimbel (who died in 1997). After the DWC Trust was created, it was divided into four separate “family branch trusts,” one for each of the Chertkofs’ four children.[1] Upon the death of the last of the Chertkofs’ four children, the trust assets were to be distributed. The DWC Trust Holding Company (the “Holding Company”), a Maryland corporation, was created after the death of Jack Chertkof in 1982. As a nominee corporation, it held bare legal title to the trust properties, for the benefit of the heirs under the DWC Trust.[2] The individuals involved in this case had remainder or beneficial interests in the DWC Trust assets.
Following the death of Jack Chertkof, both Helen Gimbel and Ethel Posnick, the sisters of Jack Chertkof, became trustees of the DWC Trust. They entered into a management agreement (the “Agreement”) with appellant, dated April 28, 1988, as to the trust properties. Ms. Posnick signed the Agreement on behalf of the trustees. According to appellant, even after the deaths of Posnick and Gimbel, and continuing until September 22, 1999, appellant provided all of the services required under the Agreement to the eleven “tenants-in-common,” including appellees.
Paragraph 13 of the Agreement provides: “All covenants and agreements herein contained shall bind and inure *124 to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns----”
Under the Agreement, appellant became the “sole and exclusive” management agent for the rental properties that were in the trust, and the “sole and exclusive agent for lease of any of the Properties.... ” Under ¶ 6 of the Agreement, appellant had “the right and the duty to conduct lease negotiations” for the various properties. Further, the manner in which lease commissions for new leases were to be calculated is set forth in ¶ 14.1.1 of the Agreement. With respect to appellant’s eligibility for a lease commission, the Agreement states in ¶ 14.1.2:
14.1.2 It is understood and agreed that Agent shall be the sole and exclusive agent for lease of the Properties and shall be entitled to a commission for lease of any of the Properties for which it (alone or working with another agent or broker) procures a tenant, as provided above----
The term of the Agreement was for one year, commencing on May 1, 1988, after which it was to continue on a month-to-month basis. The Agreement was to terminate 60 days after service of a written notice to that effect by either party. See ¶ 2.
Paragraph 14.4 of the Agreement is relevant. It provides:
14.4 Upon expiration of this Agreement, Agent shall furnish Owners with a list of prospects who have inspected or made inquiries respecting any of the Properties and if within six months after the termination of this Agreement, any of the Properties is sold or leased to any prospect on such list, Agent shall be entitled to receive from Owners an amount equal to the commission provided for above, as if the transaction had occurred prior to the expiration of the terms of this Agreement. However, Agent shall not be entitled to any commission if any of the Properties is sold or leased to any other person at any time after termination of this Agreement or to any pros *125 pect more, than six months after the termination of this Agreement
(Emphasis added.)
Paragraph 15.2 of the Agreement is also noteworthy. It states:
15.2 If during the term of this Agreement, Owners sell a Property (or more than one Property) that is subject to management hereunder, that Property shall be withdrawn from the legal operation and affect [sic] of this Agreement from and after closing for the sale of that Property, and Agent shall no longer be entitled to management fees for any such Property after such closing, but Agent shall be entitled to any Lease Commission for such Property to which agent may be entitled under section Fourteen above for the remainder of the then current term of the Lease for such Property.... This provision shall include and apply to a sale or transfer to another person (or persons) and/or entity (or entities) who may already be one of the Owners hereunder, so that such person (or persons) and/or entity (or entities) shall then hold full title to the Property so sold or transferred and the other then Owners of such Property hereunder shall divest themselves entirely of any title or interest in such Property.
(Emphasis added.)
Helen Gimbel, the last surviving child of David and Annie Chertkof, died in 1997. According to appellant, upon the death of Ms. Gimbel, the beneficial or remainder interests in the remaining trust properties passed to the eleven grandchildren or great-grandchildren of David and Annie Chertkof, as tenants in common.[3] They are: Howard L. Chertkof and E. Robert Chertkof, the sons of Jack Chertkof; Joseph Gimbel and Stephanie Prince, the children of Helen Gimbel; Martha Lee Fendler and Jeffrey Clayten, the children of Ben Clayten; Helene Miller and Phyllis Hayman, two of the three daughters of Ethel Posnick, and Sharon Silveria, Diane Kelty, and Donald Brown, the grandchildren of Ethel *126 Posnick and the children of Ethel Posnick’s late daughter, Ms. Brown, who predeceased Ethel Posnick.[4]
In August 1997, E. Robert and Howard Chertkof filed an action in the Circuit Court for Baltimore County for sale in lieu of partition, seeking to separate the interests of the eleven beneficial owners of the trust properties, including the Property at issue here. R. Taylor McLean, Esquire was appointed as trustee to sell the properties, pursuant to a Consent Order of October 26, 1998. Appellees filed counterclaims as well as “third party” claims against appellant, alleging breaches of various obligations under the Agreement. Those claims were dismissed voluntarily, without prejudice, on November 9,1999.
All of the trust properties were sold by the trustee, either to third parties or to the appellees. In particular, the Property was sold by the Trustee to the appellees, pursuant to a Contract of Sale dated April 19, 1999 (the “Contract”).[5]
Paragraph 9 of the Contract states, in part: “Buyer, who is now a beneficial owner of the Property, has agreed to purchase from Seller, who is the remaining beneficial owner of the property, all of Seller’s interest in the property for the amounts shown in Exhibit B____” As to the subject Property, appellees acquired the Seller’s interest of 64.444%. Therefore, prior to the settlement on September 22, 1999, [together, appellees were] the beneficial owner of 35.55% of the subject Property. The Contract provides that the purchase of the Seller’s interest was “intended to be the entire tenant in common interests in the Property of Seller.”
*127 The Property was the last remaining property under the Agreement. Therefore, following the settlement on the Contract on September 22, 1999, all of the properties managed by appellant under the Agreement had been disposed of. Accordingly, pursuant to the terms of ¶ 2 of the Agreement, by letter dated August 31, 1999, appellant tendered a 60 day notice of its intent to terminate the Agreement. In accordance with ¶ 14.4 of the Agreement, appellant identified the State of Maryland as a prospective lessee of the Property.
Effective December 15, 1999, and within six months of the termination of the Agreement, the State entered into a lease with appellees with respect to the Property. The lease generates annual gross income of $220,000.00 and carries a ten-year term. It is that lease that has spawned the underlying controversy.
Appellant claims that, prior to execution of the contract, and before settlement, “the broker had engaged in substantial lease negotiations, as per the exclusive listing agency provided in Management Agreement, with the State of Maryland, Department of Human Resources (‘DHR’), for commercial space in the Property, services of which appellees w[ere] aware and accepted.” In particular, appellant contends that the “appellant spent hundreds of hours obtaining the DHR as a tenant, negotiating the terms of the lease, and proposing tenant improvements and providing cost estimates for that tenancy.” Moreover, by letter of May 15, 1997, appellant maintains that appellees were fully informed of the proposal. Appellant also contends that the lease executed in December 1999 “tracks the 1997 proposal of appellant in material respects.” Alternatively, even if appellant were not the procuring cause of the lease, appellant asserts that, under the Agreement, it is entitled to a commission because it was the exclusive agent for the Property. Because no commission was paid, appellant sought to enforce its rights under the Agreement by filing the Petition.
Appellees counter that they did not execute a management agreement with appellant and are not bound by one. *128 Asserting that appellant had ceased negotiations with the State in 1997, appellees also contend that the lease between them and the State was negotiated by appellee Joseph Gimbel and a broker other than appellant, and that Joseph Gimbel devoted considerable effort to the negotiations. Further, appellees assert that the Contract was entered by [them] in April 1999, without notice of appellant’s claim to a commission.
Upon the filing of the Petition, the circuit court issued a show cause order on April 11, 2000. On May 5, 2000, appellees filed an “Answer Showing Cause Why A Broker’s Lien Should Not Issue,” along with an affidavit of Joseph Gimbel. The show cause hearing took place on May 24, 2000. Thereafter, on July 3, 2000, the court issued an Order finding probable cause to believe that appellant was entitled to a broker’s lien; the court established an interlocutory lien on the Property, in the amount of $54,862.50. Moreover, the Order provided for a trial limited to the following four issues:
(1) Whether the defendants appellees are parties or successors to the Management Agreement in which the rights to a commission are contained;
(2) Whether the Management Agreement was terminated by the Circuit Court for Baltimore County by Consent Order of October 26, 1998;
(3) Whether and to what extent any commission payable to Howard L. Chertkof & Co., Inc. due pursuant to paragraph 14.4 of the Management Agreement must be earned pursuant to paragraph 14.1.2 of the Management Agreement; and
(4) Whether and to what extent any commission payable to Howard L. Chertkof & Co., Inc. would have to be reduced by the commission paid to Michael Glick for his efforts in procuring the lease [for the subject Property].
A bench trial was held on May 14, 2001. At the conclusion of trial, the court asked the parties for post-trial submissions on the issue of whether appellees were “bona *129 fide purchasers for value” of the Property, an issue that was apparently first raised by appellees at trial. Thereafter, by letter dated May 18, 2001, the court, sua sponte, raised the issue of whether ¶ 15.2 of the Management Agreement applied to the matters before the court, and asked the parties to address that issue in their post-trial memoranda.
In an Opinion dated June 6, 2001, the circuit court concluded that appellant was not entitled to a broker’s lien. Consequently, the court struck the interlocutory broker’s lien and denied the Petition. In reaching its conclusion, the court relied on ¶ 15.2 of the Agreement and determined that appellees were bona fide purchasers for value of the Property-
Chertkof I, op. at 2-10.
Appellant appealed the circuit court’s ruling. In Chertkof I we dismissed the appeal for lack of a final judgment. We remanded the case to the circuit court, directing that court to place a separate document in the record reflecting that a final judgment was entered for or against any of the parties. Following entry of an order granting judgment in favor of appellees, appellant timely filed the instant appeal.
We shall include additional facts in our discussion as necessary.
DISCUSSION
The circuit court ruled that, for two reasons, “no commissions are due and owing to” appellant. The court concluded, first, that the terms of the Agreement, in particular ¶ 15.2, prohibited appellant’s claim for a commission. In construing that paragraph, the court determined that the sale of the Property to appellees resulted in the Property having been “withdraw[n] from the legal operation and effect of the Agreement,” and, thus, appellees did not owe appellant a commission relating to the subsequent lease of the Property.
The court concluded, second, that, “[e]ven if the Management Agreement itself did not preclude the claim for a commission, the broker’s lien statute,” codified at RP § 14-301 et *130 seq., barred appellant’s claim for a commission. The court based this conclusion on its preliminary finding that appellees were bona fide purchasers of the Property for value and, consequently, pursuant to RP § 14-302(b)(2)(i), a broker’s lien could not be established against the Property.
The court, however, could not properly rely upon either basis to support its ultimate decision that appellant was not entitled to a broker’s lien. As we shall discuss, by not adhering to the applicable statutory procedures, appellees waived the argument that, by operation of ¶ 15.2 of the Agreement, the Property was withdrawn from the purview of the Agreement and, as a result, was no longer subject to a broker’s lien. In the absence of notice to appellant that appellees would be litigating their entitlement to a lien as against the ¶ 15.2 defense, it was fundamentally unfair to appellant and thus error for the court to have ruled, on this basis, that appellant was not entitled to the requested lien.
It was equally unfair to appellant that the court found appellees to have been bona fide purchasers of the Property for value, even though appellees had not raised this defense before trial. It was thus error for the court to have ruled, as a consequence of that finding, that appellant was not entitled for this reason as well to a broker’s lien on the Property. Finally, although our disposition of the case does not require that we address the merits of the court’s ruling that appellees were bona fide purchasers, we shall comment on the issue for future guidance.
I.
With regard to ¶ 15.2 of the Agreement, the court found:
Chertkof & Co. provided notice of its intent to terminate the Management Agreement on August 31, 1999. Pursuant to the Management Agreement, the Agreement itself terminated sixty days after service of that notice. Thus the Agreement actually terminated, at the latest, on October 30, 1999.
*131 The contract for the sale of the [ ] [Property was entered on April 19,1999, and the closing occurred on September 22, 1999. Thus a sale of one of the properties that was subject to the Management Agreement occurred during the term of the Agreement. In accordance with ¶ 15.2, that property is considered to have been withdrawn from the legal operation and effect of the Agreement from and after the date of closing, which was September 22, 1999. As specifically stated in ¶ 15.2, “agents shall be entitled to any lease commissions for such property to which agent may be entitled under ¶ 14 above for the remainder of the then-current term of the lease of such property.” Thus, i[n] accordance with the express language of ¶ 15.2, the only lease commissions that Chertkof & Co. can seek under f 14 are those for the balance of [the] then-current lease. Otherwise, the property is considered to be withdrawn from the legal operation and effect of the Management Agreement. Accordingly, no commissions are due and owing to Chertkof & Co. on the lease with the State of Maryland that was entered after the termination of the Management Agreement.
(Footnotes and record citations omitted.)
Appellant contends, first, that the court erred in deciding appellant’s entitlement to a broker’s lien by resort to ¶ 15.2, because appellees had waived the defense of the arguably foreclosing effect of ¶ 15.2 upon this case. Appellant specifies that appellees did not include any reference to ¶ 15.2 in either their answer to the show cause order or the affidavit of Joseph Gimbel that accompanied the answer; nor did they make any effort to have ¶ 15.2 included among the issues to be resolved at trial. Appellant further argues that, in any event, the circuit court “erred in interpreting ¶ 15.2, without any extrinsic evidence, to provide that, upon the sale of any Property covered by the Agreement, the only lease commission that would be payable to appellant, under any circumstances, would be a commission for a lease already in place at the time of the sale.”
*132 Appellees, in addition to maintaining that the circuit court properly interpreted ¶ 15.2, respond that they did not waive consideration of the ¶ 15.2 issue. Appellees state that, throughout the litigation, they made clear that they were not bound by the Agreement at all, because there was no contractual privity between them and the parties to the Agreement. They insist that subsumed within this argument is the argument that appellant was foreclosed by ¶ 15.2 of the Agreement from seeking a commission on the Property.
We agree with appellant’s first argument that appellees did not argue the implications of ¶ 15.2 until invited to do so by the trial court, after the trial, in the post-trial submissions. We also agree that, because appellees did not take the steps necessary to have this question specified for trial, it was waived. The court therefore was precluded from deciding, on this ground, the merits of appellant’s petition for a broker’s hen.
We come to this conclusion by resort to the broker’s lien statute itself. This statute is modeled to a large extent upon the mechanic’s lien statute and, like that statute, “is remedial and shall be so construed to give effect to its purpose.” RP § 14-310(a).[2] Just as does the mechanic’s lien statute, the broker’s hen statute prescribes in detail the procedure for obtaining a broker’s hen on commercial property. Because of its relevance to our decision, we outline that procedure here.
Upon the filing of a petition and affidavit(s), RP § 14-304(a), the circuit court must determine if, on their face, a hen appears warranted, RP § 14-305(a)(l). If so, the court issues *133 a show cause order, directing the property owner to show cause why the lien should not attach. RP § 14—305(a)(2).
Section 14-305(a)(3) lays out what must be contained in the property owner’s response to the show cause order, and describes the consequences of the owner’s failure to comply with the statute’s provisions:
(1) If the owner desires to controvert any statement of fact contained in the affidavit supporting the petitioner’s claim, the owner shall file an affidavit in support of the owner’s answer showing cause.
(ii) The failure of the owner to file an opposing affidavit shall constitute an admission for the purposes of the proceedings of all statements of facts in the affidavit supporting the petitioner’s claim, but shall not constitute an admission that a broker’s petition or affidavit in support of the broker’s petition is legally sufficient.
This provision is, in material respect, identical to RP § 9-106(a)(2) of the mechanic’s lien statute. We have interpreted RP § 9-106(a)(2) to mean that an owner’s failure to file an answer asserting the defense of waiver by the subcontractor of the right to seek a lien, is a waiver by the owner of the right to raise this defense by the subcontractor. Ocean Plaza Joint Venture v. Crouse Constr. Co., Inc., 62 Md.App. 435, 449, 490 A.2d 252 (1985); accord Westpointe Plaza II Ltd. P’ship v. Kalkreuth Roofing & Sheet Metal, Inc., 109 Md.App. 569, 578-79, 675 A.2d 571 (stating that an owner’s failure to file an answer amounted to, inter alia, a waiver of the right to assert affirmative defenses that the Maryland Rules deem waived unless specifically pled), cert. denied, 343 Md. 564, 683 A.2d 177 (1996).
By parity of reasoning, RP § 14-305, like its counterpart provision in the mechanic’s lien statute, forecloses from consideration any defense not raised by an owner in an answer to a show cause order.
Appellees argue that the waiver rule discussed in Ocean Plaza applies only to the affirmative defenses listed in Maryland Rule 2-323(g), which must be raised in an answer or they *134 are waived. Even if we were to agree with appellees that the ¶ 15.2 defense is not waived just because they did not include it in their answer, we cannot agree with them that the trial court was entitled on its own to raise ¶ 15.2 and then decide the case based on it. Indeed, such a conclusion would contravene the overall scheme of the broker’s lien statute.
Under that statutory scheme, the show cause hearing is to be set “at the earliest possible time.” RP § 14-305(a)(4). The hearing is the equivalent of a hearing on a motion for summary judgment. See Ocean Plaza, 62 Md.App. at 446, 490 A.2d 252. At the show cause hearing, if, based upon pleadings, affidavits, admissions, and evidence then before the court, there is no dispute of material fact on any issue, the court shall either enter or deny the lien as a matter of law. RP § 14-305(b)(l), (2). If the court determines that the lien cannot attach as a matter of law, but that there is probable cause to believe that a lien should attach, then the court, as is required by the comparable mechanic’s lien provision, RP § 9-106(b)(3)(vi), “should [pass] an interlocutory order setting out the perimeters of the lien and setting the matter for the trial of all issues necessary to final adjudication.” Ocean Plaza, 62 Md.App. at 446-47, 490 A.2d 252; see also Tyson v. Masten Lumber & Supply, Inc., 44 Md.App. 293, 303-04, 408 A.2d 1051, cert. denied, 287 Md. 758 (1980). This is because the court, at the show cause stage, is not the final arbiter of the disputed facts; instead, resolution of the disputed facts must await trial.
In Tyson, we were faced with a trial court’s having entered final judgment at the show cause stage notwithstanding that there were disputed issues of material fact. We said, in this regard,
[f]or that reason alone, the judge should not have entered a final order, but instead should have followed the clear direction of § 9-106(b)(3) and Md. Rule BG 73 d 2 [now Maryland Rule 12-304(e)(2)] and should have passed an interlocutory order setting out the perimeters of the lien *135 and setting the matter for trial of all issues necessary to final adjudication.
Id. at 303, 408 A.2d 1051 (emphasis added).
Of relevance to the instant case, we went on to say:
There is yet another reason in the case now before us as to why the “final order” should not have been entered. Patently, the appellants appeared in court in answer to the show cause order. They made unmistakable the limited purpose of their visitation. Furthermore, they were not supplied, until literally the twelfth hour, with the answers to the interrogatories they had propounded to the petitioner, and they were in no position then to evaluate the answers and decide what other, if any, discovery they would employ.
Id. at 303-04, 408 A.2d 1051.
It follows from Tyson that the mechanic’s lien’s statutory scheme requires that, when it has been determined that there exist factual or legal issues that must be resolved at a trial, trial must be limited to resolution of those issues as have been identified by the court in its interlocutory order (unless, of course, the order is later modified or dissolved).
Furthermore, failure to adhere to this procedure can work a fundamental unfairness to one or both parties. The fairness issues that undergird the mechanic’s lien procedural scheme also inhere in the broker’s lien scheme. Indeed, and as we have noted, the mechanic’s lien statute is the model for the broker’s lien statute, in part because the former has a judicial gloss that informs construction of the latter. See supra note 3. We see no reason to depart from the rationale of either Tyson or Ocean Plaza as we decide the waiver issue here.
In the present case, the court itself raised the applicability of ¶ 15.2 of the Agreement, and decided that this provision of the Agreement foreclosed appellant from a broker’s lien. Yet ¶ 15.2 had not been cited by appellees in their answer to the show cause order, and it was not included among the questions identified in the interlocutory order as those that must be decided at trial. Neither did appellees seek to dissolve the order or modify it to add the ¶ 15.2 issue, which they were *136 entitled to do. See RP § 14-805(b)(4) (stating that “[t]he owner or any other person interested in the lien property may move to have the broker’s lien established by the interlocutory order modified or dissolved at any time”).
The circuit court apparently equated appellees’ asserted defense that they were not bound by the Agreement because they were not parties or successors to parties to the Agreement, with a defense that appellant was not entitled to a lien on the Property because, by application of ¶ 15.2 of the Agreement, the Property had been withdrawn from the Agreement’s purview. The circuit court decided that the “lack of contractual privity” defense to application of the Agreement “fairly raises the argument that appellees are not bound by the operation of provisions within the Management Agreement, including ¶ 15.2.”
We do not agree. We have scrutinized appellees’ answer to the show cause order. As we see it, the arguments presented there cannot be read to include an argument under ¶ 15.2 that the sale of the Property withdrew it from operation of the Agreement. Because appellees did not raise the issue at any time before trial and did not seek to have it included among the triable issues, they waived it.
We recognize that the court gave the parties the opportunity to submit post-trial memoranda on the applicability of ¶ 15.2 to appellant’s entitlement to a hen. Putting aside the significant facts that appellees had not argued the relevance of ¶ 15.2 in their answer to the show cause order, and had not sought the issue’s inclusion among those specified for trial, the court’s decision to allow the parties to brief the issue for the first time post-trial fell far short of affording appellant a fair hearing on what turned out to be a dispositive issue.
All of this left appellant who, after all, had the overall burden to establish the entitlement to a broker’s lien, see Winkler Constr. Co, Inc. v. Jerome, 355 Md. 231, 254, 734 A.2d 212 (1999), with an adverse decision based on a theory appellees did not raise, and upon which appellant had no opportunity to defend at trial by the offer of any evidence relevant to *137 the question. We find instructive on this point the Court of Appeals’ Winkler opinion. There, the Court held that an owner, against whose property a mechanic’s lien has been claimed, has an obligation to bring to the court’s attention information that “is peculiarly within the knowledge of the owner” and would defeat the lien claim. Id. at 255, 734 A.2d 212. If, in that situation, the owner does not avail itself of the opportunity to raise the issue and present relevant evidence on it, the mechanic’s lien procedure permits the lien to be established, so long as the claimant has satisfied the conditions for it. Id.
It would seem to follow from Winkler that when, as here, the owner has not presented the issue to the attention of the lien claimant and the court, either by response to the show cause order, or by seeking to have the issue specified for trial, the issue is not a proper one for decision by the court.
Altogether, what occurred in this case concerning the ¶ 15.2 issue significantly, and unfairly, disadvantaged appellant. See Ocean Plaza, 62 Md.App. at 448, 490 A.2d 252; Tyson, 44 Md.App. at 303-04, 408 A.2d 1051. The court should not have decided the merits of appellant’s cause by reliance on ¶ 15.2 of the Agreement, which was an issue upon which appellant, who must shoulder the burden of proving the right to a broker’s lien, had no meaningful opportunity to defend.
II.
Appellant also challenges, on both procedural and substantive grounds, the court’s additional ruling that appellees were bona fide purchasers for value and, as such, were entitled to the protection afforded by RP § 14—302(b)(2)(i) of the broker’s lien statute. This section provides: “A commercial property may not be subjected to a broker’s lien under this subtitle if, prior to the establishment of the broker’s lien, legal title has been granted to a bona fide purchaser for value.”
In an argument virtually identical to that which we addressed in Part I, appellant contends that the court errone *138 ously relied on the operability of RP § 14-302(b)(2)(i) because appellees, having neither asserted this defense in their answer to the show cause order nor included it among the issues set for trial, waived their right to have the defense considered. Appellant further argues that, even if not waived by appellees, the court wrongly concluded that appellees were bona fide purchasers of the Property. Appellant asserts on this point: “There are two conditions which defeat a claim of bona fide purchaser for value: (1) where the purchaser has actual knowledge of lien-holder’s claims before the purchase, and (2) where the purchasers are in contractual privity with the lien-holder.” Appellant goes on to say: “Here, both conditions exist[ ], thus defeating appellees’ effort to be classified as bona fide purchasers for value of the Property.”
Appellees respond to appellant’s waiver argument by directing us to footnote 6 of their answer to the show cause order. Appellees maintain that this footnote raised the bona fide purchaser for value issue. Appellees also point out that, at argument on appellees’ motion for judgment, the court heard from counsel for both parties regarding the bona fide purchaser for value claim, and the court also asked the parties to submit post-trial memoranda on this issue. On the merits of appellant’s assertion that appellees were not bona fide purchasers for value, appellees respond that, because legal and equitable title to the Property passed before establishment of the lien, the Property is not subject to a broker’s lien.
We agree with appellant that the court erred in ruling that appellant was not entitled to a broker’s lien on the ground that appellees were bona fide purchasers for value. As was the case with the ¶ 15.2 defense, the bona fide purchaser for value defense was not raised by appellees in their answer to the show cause order, and, moreover, was not among the issues identified for trial. This defense, like the ¶ 15.2 defense, was waived by appellees and should not have been considered by the court.
We disagree with appellees that inclusion in their answer of a footnote citation to RP § 14—302(b)(2)(i), without more, *139 constituted an assertion of the bona fide purchaser for value defense. The footnote merely sets forth the text of RP § 14-302(b)(2)(i). Furthermore, in the text of the answer from which the footnote was dropped, appellees did not discuss the exemption for bona fide purchasers for value, nor did they assert anywhere in their answer that they held that status.
Moreover, as we have discussed in Part I, the court at the show cause stage is obliged to specify all issues for final adjudication so that the parties can have the opportunity to move to amend the interlocutory order to add issues for trial. And we have noted that the broker’s lien statute provides a mechanism for modification of the triable issues that have been identified by the court. RP § 14-305(b)(4). Appellees took no steps to expand the triable issues to include bona fide purchaser for value.
The facts that the bona fide purchaser issue was discussed (for the first time and over appellant’s objection) at appellees’ motion for judgment at the close of appellant’s case, and that the court allowed the parties to submit post-trial memoranda on the issue, do not erase appellees’ procedural dereliction. More important, we cannot say that appellant was provided a full opportunity to litigate the issue. It cannot be gainsaid that, had the issue been raised before trial, appellant would have had the chance for discovery on the issue and been prepared to present evidence on it at trial.[3]
We therefore hold that, in the absence of an assertion by appellees at any time before trial that as bona fide purchasers for value they were not subject to a broker’s lien, that issue, *140 like the ¶ 15.2 issue, should not have been considered by the circuit court in ruling on the case.
III.
Our holding, above, disposes of the merits of the bona fide purchaser defense. We shall nonetheless comment upon it for any guidance it might have for future cases.
It is well settled that one who purchases real property without notice of prior equities is protected as a bona fide purchaser for value. See, e.g., Lewis v. Rippons, 282 Md. 155, 161-62, 383 A.2d 676 (1978); Grayson v. Buffington, 233 Md. 340, 343, 196 A.2d 893 (1964). We recently set forth the rule for determining whether a purchaser had notice of any prior equities or unrecorded interests that would preclude him from being entitled to protection as a bona fide purchaser. Beins v. Oden, 155 Md.App. 237, 244, 843 A.2d 147 (2004). We said that if the purchaser “ ‘had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.’ ” Id. (citations omitted).
In the present case, the circuit court stated on the issue of bona fide purchaser:
The only issue is whether these appellees are “bona fide” purchasers, in that appellant argues that they were on notice of the potential existence of a claim for a commission at the time the sale was consummated.
In the peculiar factual context of this case, the court does not find that argument convincing. The continued applicability of the commission provisions of the Management Agreement was debatable after the entry of [the] Consent Order.[4] At the time of the contract for purchase of the *141 property, and at the time of the actual closing, no lease had been consummated. The sale was a legitimate, arms-length transaction, as it was done under Court supervision by a Court-appointed trustee.
This was not a sale that, in any way, was intended to shelter or avoid a claim. It was also one in which the potential for a future claim was, at best, debatable at the time of the sale. Under these circumstances, the Court finds that these appellees were bona fide purchasers for value, against whom a lien cannot be asserted pursuant to RP § 14—30[2(b) ](2)(i).
The problem with the court’s reasoning is that it seems to ignore the evidence that appellees knew of the Agreement and, as beneficial owners of the Property, benefitted from the services rendered by appellant under the Agreement. Moreover, there was undisputed evidence that appellant notified appellees, at least prior to settlement, of its intention to enforce the terms of the Agreement. And the record before us indicates that appellees apparently asserted, in prior litigation, that they were parties to the Agreement and were entitled to enforce it against appellant.
The court made no findings concerning any of this evidence. In particular, the court made no finding whether appellees knew of appellant’s claim and, if so, when they knew; nor did the court determine whether appellees were parties to the Agreement. A finding that appellees knew of the claim before the transfer of title would certainly seem to negate their status as bona fide purchasers. See Beins, 155 Md.App. at 244, 843 A.2d 147; The Talbott Lumber Co. v. Tymann, 48 Md.App. 647, 654, 428 A.2d 1229 (stating, in a mechanic’s lien case, that a buyer is not a bona fide purchaser for value if, at the time legal title was transferred, the purchaser “had any notice ... of appellant’s claim or potential claim, or any reasonable cause to make inquiry”), cert. denied, 290 Md. 723 (1981). A finding that appellees were parties to the Agree *142 ment (incidentally, one of the questions identified by the judge who issued the interlocutory order as having to be decided at trial) would similarly seem to negate bona fide purchaser status. See York Roofing, Inc. v. Adcock, 333 Md. 158, 169, 634 A.2d 39 (1993) (observing that the transfer of legal title will not confer bona fide purchaser for value status if the “new” legal owner is in contractual privity with the lien claimant on the underlying obligation). The circuit court erred in deciding that appellees were bona fide purchasers of the Property without first deciding either of these questions.
IV.
We have explained why the court should not have relied on either the ¶ 15.2 rationale or the bona, fide purchaser rationale in ruling that appellant is not entitled to a broker’s lien on the Property. In ruling as it did, the court did not decide (at least not expressly so) any of the four questions identified in the show cause order. We therefore vacate the judgment and remand this case to the circuit court for such further proceedings as the court deems necessary to resolve those as-yet-unanswered questions.
JUDGMENT VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
COSTS TO BE PAID BY APPELLEES.

. Appellant stated in its reply brief that Mr. Chertkof died in September 2002.

 According to appellant’s Exhibit 1A, it appears that Jack Chertkof, Ethel Posnick, and Helen Gimbel each had a 30% interest in the DWC Trust, while Ben Clayten only had a 10% interest.

 At his deposition on May 14, 2001, Howard Chertkof characterized the Holding Company as a legal entity, with its own tax number. He also asserted that “nominee title was given to the DWC Trust Holding Company for the tenants in common.”

 Appellees dispute that the trust beneficiaries were tenants-in-common as to the Property. In support of appellant’s assertion, appellant refers us to E.470 of the Joint Record Extract, which contains the first page of the contract of sale dated April 19, 1999. It does not show that the heirs were tenants in common.

 We have not found a reference to Ms. Brown’s first name in the Record Extract.

 According to appellant, the Contract of Sale was actually signed on April 29, 1999, but the Trustee mistakenly placed the wrong date on it.

. The legislative history of the broker’s lien statute reveals two reasons why it was modeled after the mechanic’s lien statute: the mechanic's lien law had survived testing for constitutionality; and litigants, lawyers, and courts could look to the case law interpreting comparable provisions of the mechanic’s lien statute when construing provisions of the broker’s lien law. Hearing on SB 749 Before the Senate Comm, on Judicial Proceedings, 1994 Leg., 408th Sess. (Md.1994) (statement of Alvin C. Monshower, Jr., Esq., Maryland Association of Realtors, Inc.), at 3.

. We note that the court placed upon appellant the burden of proving that appellees were not bona fide purchasers for value, rather than assigning to appellees the burden of proving that they were bona fide purchasers for value. The court cited The Talbott Lumber Co. v. Tymann, 48 Md.App. 647, 428 A.2d 1229, cert. denied, 290 Md. 723 (1981), as authority for this burden allocation. Appellant argues that the correctness of Talbott on this point has been called into question by Winkler Constr. Co., Inc. v. Jerome, 355 Md. 231, 734 A.2d 212 (1999). In light of our disposition, we need not decide this question.

. On October 26, 1998, the circuit court entered a consent order in case number 03-C-97-008107 naming R. Taylor McLean, Esq., trustee, *141 responsible for selling the properties of the DWC Trust Holding Company.